## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RUTH JOHNSON** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | **Civil No.: PJM 11-1195** |
| | * | |
| **BOARD OF EDUCATION OF PRINCE** | * | |
| **GEORGE'S COUNTY** | * | |
| | * | |
| **Defendant** | * | |

### <u>MEMORANDUM OPINION</u>

### I.

Ruth Johnson has brought an employment discrimination suit against Board of Education of Prince George's County (the "Board") under Title VI of the Civil Rights Act of 1964.  42 U.S.C. § 2000d *et seq.* She alleges retaliatory hostile work environment based on protected activity pertaining to race. Under Title VI, a plaintiff may only recover if the alleged discrimination occurred during the time period when federal funds were received which had a primary purpose of providing employment.  The only federal funds identified by Johnson (as well as by Plaintiffs in two related cases, Everhart, 11-cv-1196, and Allison, 11-cv-1329), were purportedly received by the Board pursuant to the  American Recovery and Reinvestment Act of 2009 ("ARRA").  Pub. L. 111-5, 123 Stat. 115 (Feb. 17, 2009).

The Court held a special jury trial in this and related cases, in which the parties presented evidence on the issue of whether a primary purpose of ARRA was to provide employment.  The Jury was asked to make a finding of fact in this regard and concluded that employment was a primary purpose of ARRA.

During the special trial, the Board argued that, in any event, it did not receive funds during Johnson's employment at Largo High School such that Johnson's claim of harassment and retaliation must be dismissed as a matter of law. Johnson counter-argued that the Board did receive funds during the relevant time period.  The parties agreed to submit the issue of the timing of the receipt of federal funding to the Court for decision, rather than the jury, and the Court ordered briefing on the issue. The Court now considers the parties' arguments on the sole issue of whether the Board received ARRA funds during the time period relevant to Johnson's claims. For the following reasons, the Board's Motion to Dismiss will be **DENIED**.

## II.

Section 601 of Title VI bars discrimination in "any program or activity *receiving* federal financial assistance." 42 U.S.C. § 2000d (emphasis added).

Section 604 limits the statute in one important respect:

> Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d-3. "[P]rivate individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages." *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). The enforcement limitation in § 604 applies to private suits, notwithstanding the language referring to "actions . . . by any department or agency." *Reynolds v. School Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1531 n. 8 (10th Cir. 1995) (collecting cases); *Ingram v. Morgan State Univ.*, No. 95–2314, 1996 WL 13861, at *1 (4th Cir. Jan. 16, 1996).

Although the case law under Title VI private causes of action is still developing, courts have consistently held that the funds must be received during the relevant time period of the alleged discrimination for a cause of action to survive. *See, e.g.*, *Hupart v. Board of Higher Ed.*

2

*of City of New York*, 420 F. Supp. 1087, 1104 (S.D.N.Y. 1976) (since defendant's biomedical

program did not receive federal funds until after alleged reverse discrimination had occurred,

jurisdiction of the court could not be founded on Title VI); *see also Vanes v. Indiana Comm'n on*

*Public Records*, 2:07-CV-00063 RLYWGH, 2008 WL 763374, at *4 (S.D. Ind. Mar. 20, 2008)

(in context of the Rehabilitation Act, "the entity must be a recipient of federal financial

assistance during the time of the alleged discriminatory conduct").  Further, the participle

"receiving" contained in the statute suggests simultaneity. *See, e.g.*, *Bachman v. Am. Soc. of*

*Clinical Pathologists*, 577 F. Supp. 1257, 1260 (D.N.J. 1983) ("The present tense language of

the statute . . . reflects the fact that the federal funding is conditioned on the recipient's

simultaneous compliance with the anti-discrimination provisions of section 504.").

## III.

The parties do not dispute that the federal funds on which Johnson bases her claim,

ARRA funds, must have been received by the "program or activity" during the time period

covering the Title VI claim.  Nor do they dispute that the cut-off date for Johnson's alleged

discrimination was August 2009, when she was transferred involuntarily from Largo High

School. Second Amended Compl. ¶ 56 (Paper No. 80). What they dispute is the meaning of the

phrase "receiving" under the statute, i.e. the date as of which the Board should be deemed to

have been a recipient of the ARRA funds.

Johnson suggests three different dates on which the Board could be deemed to have

received the funds: (1) February 17, 2009, the date of enactment of ARRA by Congress; (2)

April 1, 2009, the date the State of Maryland received the ARRA funds, or (3) June 2009, the

date the Board received an equipment grant under ARRA. The Board takes issue with each of

these proposed dates, and proposes two alternative dates as to when it was a recipient of the

funds, both of which post-date Johnson's departure from Largo: September 21, 2009, the date the

Board received $89,000 from a School Lunch Program Grant, or December 3, 2009, the date

Stabilization Funds were received by the Board.

The Court considers these arguments.

## A.

Johnson first argues that the Board received ARRA funds as of the date of Congressional

enactment of ARRA. Citing evidence from trial, she says that because entities were permitted to

use ARRA funds retroactively to debts existing as of February 17, 2009, the Board should be

considered a recipient as of that date. The Court is unpersuaded.

Courts have made clear that the relationship between the receipt of federal funds and the

obligations under Title VI (and other Spending Clause legislation) is analogous to a contract:

> Title VI invokes Congress's power under the Spending Clause, U.S. Const., Art.
> I, § 8, cl. 1, to place conditions on the grant of federal funds. We have repeatedly
> characterized this statute and other Spending Clause legislation as "much in the
> nature of a *contract*: in return for federal funds, the [recipients] agree to comply
> with federally imposed conditions." Just as a valid contract requires offer and
> acceptance of its terms, "[t]he legitimacy of Congress' power to legislate under
> the spending power . . . rests on whether the [recipient] voluntarily and knowingly
> accepts the terms of the 'contract.'

*Barnes v. Gorman*, 536 U.S. 181, 185-86 (2002) (internal citations omitted). To determine

whether an entity is a recipient of federal funds, courts have looked to whether it "accepted the

terms and obligations" of the funds, or was "in a position to accept or reject the funds." *See, e.g.*,

*Vanes*, 2008 WL 763374, at *6 ("The relevant inquiry for purposes of application of the

Rehabilitation Act is when [defendant] agreed to accept the terms and conditions of the grant,

including its antidiscrimination assurances."). "To meet the definition of 'receiving Federal

financial assistance' . . . the employer must be qualified and approved for receipt of Federal

financial assistance." *River-Flores v. Puerto Rico Telephone Co.*, 840 F. Supp. 3, 5 n.1 (D.P.R. 1993), *vacated on other grounds*, 64 F.3d 742 (1st Cir. 1995).

Johnson's argument that the date of receipt should be retroactive to the passage of ARRA, thereby imposing Title VI obligations as of that date, is inconsistent with the notion that receipt of federal funds is "in the nature of" a contract. Before it in fact applied for or received any funds, the Board would not have been in a position to "voluntarily and knowingly [accept] the terms" accompanying receipt of ARRA funds as of February 17, 2009. Further, merely allowing the Board to cover debts retroactively is inconsistent with the simultaneity implied by the statute's use of the concept of "receiving," even though arguably it might be said that the funds were constructively received retroactively. The Court is disinclined to venture into so metaphysical a realm.

## B.

Next, Johnson argues that the Board should be deemed to have received the funds immediately when they were received by the State of Maryland and its Department of Education in April 2009. She bases this argument on the definition of "program or activity" in Title VI, which includes "all the operations of":

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended in the case of assistance to a State or local government;

(2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or

(B) a local educational agency (as defined in section 7801 of Title 20), . . .

> (4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3); any part of which is extended Federal financial assistance;

§ 2000d-4a.  Johnson says that because, broadly speaking, the Board is an "agency" of the state, or an "entity of" the State, it received funds as soon as Maryland, through the Department of Education, received those funds.

Her argument fails, however, to recognize that the statute expressly distinguishes an "agency" or "entity of" the State, § 2000d-4a(1)(A)-(B), from a local educational agency, § 2000d-4a(1)(A)-(B), defined by cross-reference at 20 U.S.C. § 7801(26)(A). In fact, the Board is clearly covered by the definition of "local educational agency," which means:

> a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or of or for a combination of school districts or counties that is recognized in a State as an administrative agency for its public elementary schools or secondary schools.

20 U.S.C. § 7801(26)(A).  Because the Board is clearly distinguishable from a "state agency" or "entity of the state," Johnson's attempt to fit it into those categories is at best a weak beginning.

But even if the Board were deemed covered by the other definitions, in the Court's view the timing of its receipt of funds would not change.  As the Ninth Circuit explained in *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002), "[t]he term 'program or activity' . . . does not encompass all the activities of the State. Instead, it only covers all the activities of the department or the agency receiving federal funds." *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002); *see also* 15 Am. Jur. 2d Civil Rights § 375 ("A state itself is not considered a 'program or activity' as defined in Title VI; thus only the particular subdivisions of the state which receive federal funds, and not the state as a whole, are subject to the statute.")(citing *Ass'n of Mexican-*

*Am. Educators v. State of Cal.*, 195 F.3d 465, 476 (9th Cir. 1999), *rev'd in part on other grounds on rehearing*, 231 F.3d 572 (9th Cir. 2000)).

This Court, as it happens, has already noted that:

The Maryland State Board of Education accepts federal funding on behalf of the State. That money is then distributed from the State Treasury to county boards of education, including the Board of Education of Prince George's County.

*Rogers v. Bd. of Educ. of Prince George's Cnty.*, 859 F. Supp. 2d 742, 745 (D. Md. 2012) (Messitte, J.).

Still, Johnson urges that the federal funds are "technically available" to the Board once the State has received them, and "[a]ll that stands between [the Board] and getting the actual dollars is paperwork." Plf.'s Br. 7 (Paper No. 158).  But whether "paperwork" is required, in a sense, is essential to analysis of when those funds are in fact received. Evidence at the special trial indicated that distribution of the funds to the Board was not automatic. The Board's evidence at trial supported this proposition: A document from the U.S. Department of Education states that local educational agencies must apply to the State for ARRA funds (specifically, the State Fiscal Stabilization Funds), and, when they do so, they must give assurances that they will administer the program in compliance with all applicable regulations and statutes.  Def.'s Ex. 1. Because an entity would not be deemed a recipient of federal funds unless it is in the position to accept or reject the funds, the requirement that the Board apply for funds and agree to abide by the surrounding statutory obligations clearly suggests that it cannot per se be deemed a recipient as of the date the State Board of Education received the funds.

## C.

Finally, Johnson asserts that the Board should be deemed a recipient of ARRA funds as of June 2009, when it received a $90,000 equipment grant under ARRA. The Board argues that

7

the equipment grant should not be considered because, it was not for the primary purpose of providing employment, and because, in any event, it was in a *de minimis* amount. The Court finds that Johnson's argument as to this date does have traction.

The issue at the special trial was appropriately formulated as to whether ARRA *in general* was for the primary purpose of providing employment. Indeed, nothing in the statute indicates in any way that the receipt of ARRA funds means only that funds actually used for employment must be utilized before funds are deemed received under the Act. Similarly, there is nothing to suggest that Title VI does not apply to the *de minimis* receipt of funds, even if it were allowed that $90,000 is "*de minimis*," a doubtful proposition. The evidence at trial was undisputed that the Board received the equipment grant as of June 2009. Accordingly, the Court finds that the Board received federal funds under ARRA, which (as the special jury found) had employment as a primary purpose, as of June 2009.

## IV.

In her Second Amended Complaint, Johnson alleges that she was transferred from Largo High School in August 2009, and that the transfer was retaliatory.  Because some of her critical allegations fall within the period during which the Board received ARRA funds, her claim is not dismissible as a matter of law. More than that: Because the transfer was allegedly the culmination of a continuing stream of harassing actions by Largo's principal, Angelique Simpson-Marcus, the Court will allow reference at trial (subject to an appropriate limiting instruction) to the earlier alleged hostile work environment leading up to the alleged retaliatory transfer.

The Board's Motion to Dismiss, made at trial as detailed in the Brief on the Issue of Timing of the Receipt of Federal Funding (Paper No. 157) is **DENIED**.

A separate Order will **ISSUE.**

                                             **/s/**
                                          **PETER J. MESSITTE**
                              **UNITED STATES DISTRICT JUDGE**

**July 29, 2014**